UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Joseph N. Masello

v.                              Civil No. 08-cv-136-JL
                                Opinion No. 2011 DNH 195
The Stanley Works, Inc.
and ZAG Industries, Ltd.


**MEMORANDUM ORDER**

The parties to this wrongful death action arising from the collapse of a plastic stepstool have filed a series of motions in limine challenging the admissibility of certain evidence at the upcoming jury trial.  The stepstool, manufactured by defendant ZAG Industries, Ltd., collapsed as the decedent, Joseph M. Masello, was standing on it while restocking products during his overnight shift at a Christmas Tree Shops retail store.  Masello fell backward and struck his head against the floor, causing him to fall into a coma.  He died two weeks later.

Masello's son has brought this action in his capacity as the administrator of the estates of both his father and his mother, Masello's wife, who was alive at the time of Masello's death but has since died herself.[1]  The complaint asserts state-law claims

---

[1] For clarity's sake, the court will use "Masello" to refer to the father and "the plaintiff" to refer to the son in his capacity here.

of negligent design and failure to warn, strict products liability, and breach of warranty against ZAG and the distributor of the stool, The Stanley Works, Inc.  This court has diversity jurisdiction over this action between the plaintiff--who, acting on behalf of decedents who were New Hampshire citizens when they died, is treated as a New Hampshire citizen for purposes of diversity, <u>see</u> 28 U.S.C. § 1332(c)(2)--and the defendants, Israeli and Connecticut corporations.  <u>See</u> <u>id.</u> § 1332(a)(3).

In Masello's accident, the left front leg of the stool cracked into several pieces, causing it to collapse.  The defendants' principal theory of defense is that this occurred not because the stool was defectively designed, but because part of its left front leg was already missing at the time Masello climbed onto the stool--a factual proposition for which there is no direct evidence either way, because the allegedly missing piece was not among the other parts of the stool recovered from the scene of the accident.  Nevertheless, the plaintiff's motions in limine seek to prevent the defendants from adducing any evidence in support of this theory (including a report of an investigation by the Occupational Safety and Health Administration finding that Christmas Tree Shops had violated federal workplace safety law by providing its employees with a broken stepstool) or, indeed, even arguing the theory at trial.

The plaintiff also seeks to prevent the defendants from relying on evidence of tests it conducted, which tends to show that the stepstool was safe for its intended use, and evidence of Masello's pre-existing health conditions, and his on-the-job performance and off-the-job drinking, which tends to call into question the plaintiff's claimed damages.  As fully explained infra, these motions are denied.  While the plaintiff would undoubtedly prefer to try the case without the jury's hearing or seeing anything that undermines his claims, that preference neither supports the exclusion of admissible evidence nor justifies the filing of a dozen pre-trial motions in limine toward that end.[2]

The defendants, for their part, have filed two motions in limine.  The plaintiff assents to one of those, which seeks to prevent evidence that defendant ZAG contacted one of the plaintiff's expert witnesses before the plaintiff had retained him.  The other motion filed by the defendants, which seeks to exclude evidence of ZAG's "internal brochure" about the

---

[2]Of the plaintiff's twelve motions in limine, eight address the issues just summarized, while three others are premature. The defendants assent to the remaining motion, which seeks to exclude a post mortem medical report made for workers' compensation purposes.  See infra Part II.G.

stepstool, is denied because, at a minimum, the brochure is relevant to their superseding and intervening cause defense.

## I.   **Background**

The body of the Handy 2-Step stool consists of a single piece of molded polypropylene plastic.  As its name suggests, the Handy 2-Step has two steps, connected by four legs.  Each of the legs ends in an outward pointing "toe" with a rubber tip on the bottom.  The underside of each of the steps consists of a number of supporting ribs running in a perpendicular direction from the center to the front or back side of the step.  The bottom edge of each of the intersections between a rib and the front side of the step is rounded so that the rib meets the step at a radius of 5 millimeters.  There are also two ribs, running parallel to the bottom step, that connect it to the inside of each of the front legs.  The bottom edges of these ribs are not rounded.

On the night of the accident, Masello was standing on a Handy 2-Step provided by his employer, Christmas Tree Shops, hanging beach bags for sale in its store in Salem, New Hampshire. The left front leg of the stool cracked into several pieces, causing it to collapse.  Masello fell backward, striking his head on the ground.  He was non-responsive, so paramedics were called immediately, just after 3 a.m.  The paramedics placed Masello on

4

a back board and took him to the hospital, leaving the store
around 3:40 a.m.

One of Masello's fellow employees subsequently retrieved the
stool and three broken pieces of the left front leg, but was
unable to locate the toe.  So, as mentioned at the outset, the
parties disagree over whether the toe broke off in the accident
and could not be found afterwards or whether the toe had already
broken off before Masello stepped on the stool that night.  This
disagreement is significant because the defendants' theory is
that the stool collapsed due to the absence of the toe, which
allowed the leg to slide out from under the stool when Masello
stood on it, while the plaintiff's theory is that the stool
collapsed due to the absence of a rounded edge on the bottom of
the ribs connecting the first step to each of the front legs.

As a result of striking his head in the fall, Masello
suffered a skull fracture and an acute subdural hematoma, which
caused him to fall into a coma.  Despite a craniotomy to attempt
to relieve the pressure on his brain, Masello never regained
consciousness.  He died approximately two weeks later.

In April 2008, Masello's wife, acting as the administratrix
of his estate, commenced this action, including her own claim for
loss of consortium.  ZAG and Stanley raised in their answers,
among other defenses, comparative negligence and superseding and

intervening cause.  They have not, however, sought to apportion liability to Christmas Tree Shops.  See N.H. Rev. Stat. Ann. § 507:7-e, I; DeBenedetto v. CLD Consulting Eng'rs, Inc., 153 N.H. 793, 803 (2006).

II.  **Analysis**

A.  **The "speculative argument" about the stool's missing piece**[3]

As noted at the outset, the plaintiff seeks to prevent the defendants, "whether by counsel or through introduction of any exhibit or examination of any lay or expert witness, to assert that the step stool involved in this incident was missing a piece prior to Mr. Masello's use."  The plaintiff argues that "there is no factual basis supporting [this] speculative position and therefore, it should not be referred to or raised to the jury during trial."  But the premise of this argument is wrong.  The defendants' position that the "toe" from the stool's left front leg was missing before Masello began using it is supported by a variety of circumstantial evidence.

First, the post-accident examination of the stool revealed that both of its rear legs were cracked and missing pieces. Second, as documented in the OSHA report and confirmed in the

---

[3] See document no. 65.

store manager's deposition, five of the dozen or so remaining
stools used by employees there "were also found defective and
taken out of service" immediately after the accident and that
"most of the defects were broken toes."  Third, the Christmas
Tree Shops "area loss prevention manager," who visited the store
within a day or two of the accident, testified that one of
Masello's fellow employees had collected the pieces of the broken
stepstool after the accident and delivered them to the store
manager's office.  The loss prevention manager testified that he
"confirm[ed]" with the employee who had collected the broken
stool "that he got all the pieces."  When the loss prevention
manager attempted to reassemble the stool from the broken pieces,
however, he realized that the toe was not among them, and that
its absence was obvious.  Store personnel then searched the area
of the accident for the missing piece, but were unable to find
it.[4]

Of course, this is not conclusive evidence that the piece
was missing before Masello stepped on the stool, and the
plaintiff points to a number of other facts supporting the
contrary inference.  First, there is testimony by the store's

---

[4]Photographs of the broken stool were then taken, but some
of the other broken pieces were subsequently lost, and were never
located.

7

night manager that, before the shift started, she inspected all the stepstools that were used, looking for cracks and broken pieces, but did not find any.  Second, there is testimony by one of Masello's co-workers that she had never previously noticed any problems with the stool he was using that night.  Third, just after the paramedics took Masello from the store, an outside cleaning crew arrived to scrub the floor, and the floor would have also been regularly swept and walked over after the store opened for business that day.  Thus, the plaintiff argues, any number of people could have removed the "toe" piece from the floor before store employees were able to find it.

But this evidence simply supports a plausible alternative to the defendants' theory that the piece was already missing.  It does not render that theory "speculative."  Nor does it prevent the defendants from introducing whatever admissible evidence they have to support their theory.[5]  Weighing that evidence--which is unquestionably relevant, see Fed. R. Evid. 401--and deciding what theory is ultimately more convincing, are tasks for the jury.  Indeed, this court has already ruled as much in its order denying

---

[5]Indeed, the plaintiff's motion seems circular in seeking to prevent the defendants from even arguing their theory on the ground that it lacks evidentiary support, but also seeking to prevent the defendants from adducing the very evidentiary support that the plaintiff claims is lacking.

the defendants' motion to exclude the plaintiff's liability
expert because his opinion fails to account for the chance that
the toe was missing prior to the stool's failure. Masello v.
Stanley Works, Inc., 2011 DNH 061, 9 (document no. 71).[6]

"The only limit on the positions a party can take--as
distinguished from the evidence a party can introduce--would seem
to be the general rule against 'arguments prejudicial to the
opposing party which are not supported by facts in evidence, or
which are beyond the limits of fair or sound argument, unduly
influencing or distracting the jury.'" Aumand v. Dartmouth
Hitchcock Med. Ctr., 611 F. Supp. 2d 78, 84 (D.N.H. 2009)
(quoting 75 Am. Jur. 2d Trial § 414, at 632 (2007)) (footnote
omitted). The defendants' position that the stool was missing
the toe to its left front leg before Masello stepped on it does
not fit that description. To the contrary, that is one of the
key disputed factual issues in the case. The plaintiff's motion

---

[6]In fact, the plaintiff argued in response to that motion
that, by making such an argument, the defendants were "putting
the Court in a position of having to determine the admissibility
of [the expert's] opinions and testimony based upon factual and
evidentiary disputes that will all be resolved in Plaintiff's
favor at trial." Though that strategy proved unsuccessful, the
plaintiff now seems to have decided to give it a try himself,
seeking what amounts to a pretrial resolution of a disputed
factual issue by the court in a case to be tried by a jury. That
is not the appropriate function of a motion in limine, which
"should not be used to resolve factual disputes." C&E Servs.,
Inc. v. Ashland Inc., 539 F. Supp. 2d 316, 323 (D.D.C. 2008).

to prevent the defendant from even taking a position on that issue, or from introducing any evidence in support of that position, is denied.

**B.    The OSHA investigation and report**[7]

The plaintiff also "seeks the complete exclusion of all OSHA related actions and information from the trial," including "any reference through direct or cross-examination of any witness, the introduction of any documents or photographs or reliance upon this information by any expert."  Just over two weeks after Masello's accident, OSHA conducted a "comprehensive inspection" of the Salem Christmas Tree Shops location, interviewing, among others, the store's manager and its director of loss prevention. The manager told the investigator that "after the accident they examined the rest of their stools and five of the remaining stools were also found defective and taken out of service."  The investigator also took photographs of the broken stepstool involved in the accident, and reviewed results of the tests on the Handy 2-Step performed in the late 1990s.

Based on this inspection, which is summarized in a 10-page report, OSHA concluded that Christmas Tree Shops had violated

---

[7]See document no. 61.

10

§ 5(a)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(1), in that its "employees were exposed to the hazard of falling while working from a damaged 'Handy 2-Step' plastic stool."  OSHA deemed this a "serious" violation and fined the company $5,000.  Christmas Tree Shops did not contest either the finding of violation or the amount of the fine.

As the plaintiff acknowledges, Rule 803(8)(C) of the Federal Rules of Evidence provides for an exception to the hearsay rule in civil actions for reports setting forth "factual findings made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."  The OSHA report here fits easily within this exception.  As the court of appeals has observed, "accident reports containing investigators' conclusions and opinions" satisfy Rule 803(8)(C) "'[a]s long as the conclusion is [1] based on a factual investigation and [2] satisfies the Rule's trustworthiness requirement.'"  Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 45 (1st Cir. 1991) (quoting and adding bracketing to Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170 (1988)).

The plaintiff does not question that the OSHA investigator's conclusion that Christmas Tree Shops exposed its employees "to the hazard of falling while working from a damaged 'Handy 2-Step' plastic stool" was based on a factual investigation.  Instead,

11

the plaintiff argues that this conclusion is untrustworthy because the investigation did not include "any sworn statements, cross-examination or proceedings in an adjudicatory venue." But the test for trustworthiness under Rule 803(8)(C) is not nearly so stringent. To the contrary, as this court recently observed, the court of appeals has held that "an initial presumption of admissibility" attaches to an officer's accident report, including its conclusions, so long as it is based on his or her factual investigation (which, again, the report here indisputably was). Westerdahl v. Williams, ___ F. Supp. 2d ___, 2011 DNH 136, 15 (quoting Lubanski, 929 F.2d at 45-46).

So, while the fact that the report was not the product of an adjudicatory hearing at which witnesses were sworn and cross-examined may have some bearing on its trustworthiness, see Fed. R. Evid. 803(8) advisory committee's note (1974), it cannot be called "untrustworthy" for that reason alone. See Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (holding that the lack of a hearing "is not determinative by itself" of the Rule 803(8)(C) inquiry); Sabel v. Mead Johnson & Co., 737 F. Supp. 135, 142-43 (D. Mass. 1990) ("the weight of authority is that no formal proceedings are necessary to satisfy the prerequisites of the rule") (citing cases). And the plaintiff has not pointed out any other deficiency calling the

trustworthiness of the report into question, such as the timeliness of the investigation (which began with a visit to the store about two weeks after the accident) or the investigator's "motivation problems" or lack of "special skill or experience." Fed. R. Evid. 803(8) advisory committee's note (1974).

If anything, the conclusion appears trustworthy because it is based principally on the admission of the store manager--which she repeated, under oath, at her deposition in this case, where she was subject to cross-examination--that "five of the remaining stools were also found defective and taken out of service."  The report, including its conclusion that Christmas Tree Shops endangered its employees by providing them with a broken stool, readily satisfies Rule 803(8)(C).

The plaintiff also argues that the OSHA report is irrelevant, see Fed. R. Evid. 401, and that its prejudicial effect outweighs its probative value, see Fed. R. Evid. 403.  The court disagrees on both counts.

First, as just discussed at length in the preceding section, whether the stool that collapsed beneath Masello was already compromised before he stepped on it is a "fact that is of consequence to the determination of [this] action," and the condition of other stools in the store at that point has a "tendency to make the existence of [that] fact . . . more or less

13

probable than it would be without the evidence." Fed. R. Evid. 401.  The plaintiff does not seriously argue to the contrary.

The court also disagrees with the plaintiff that the report's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.  As just discussed, the report reflects a comprehensive investigation of the very same incident that gave rise to this lawsuit, so it is "highly probative." Davignon v. Hodgson, 524 F.3d 91, 113 (1st Cir. 2008) (affirming the admission, over a Rule 403 objection, of a state labor commission's decision on whether the defendant had violated state law by engaging in the same conduct giving rise to the lawsuit at issue).

The plaintiff argues that the report will improperly "suggest to the jury that because OSHA focused on the employer and working conditions of the injured employee and incident location (as is its focus and purpose), the jury should do the same and fault [Christmas Tree Shops] for the incident," rather than the defendants.  While that is certainly a possibility, it does not amount to unfair prejudice.  Indeed, "[v]irtually all evidence is prejudicial--if the truth be told, that is almost always why the proponent seeks to introduce it--but it is only unfair prejudice against which the law protects." United States

14

v. Pitrone, 115 F.3d 1, 7 (1st Cir. 1997).  To counter the effect of the report, the plaintiff will be free to emphasize any limitations on the investigation (including his point that OSHA's mandate is to regulate the safety of the workplace, rather than the design of products) through appropriate cross-examination or requests for limiting instructions or judicial notice.

In fact, the plaintiff's point would seem to diminish the potential prejudicial effect of the report, since the trial here will be about the defendants' responsibility for the accident, rather than Christmas Tree Shops's responsibility for the accident (except insofar as the conduct of Christmas Tree Shops amounted to a superseding and intervening cause).  That serves to distinguish this case from those the plaintiff cites, all of which upheld the exclusion, from discrimination trials, of reports by the responsible investigative agencies as to whether the defendant engaged in the very discrimination at issue in the trial.  See Smith v. Mass. Inst. of Tech., 877 F.2d 1106, 1113 (1st Cir. 1989); Denny v. Hutchinson Sales Corp., 649 F.2d 816, 822 (10th Cir. 1981); Gillin v. Fed. Paper Bd. Co., 479 F.2d 97, 99 (2d Cir. 1973); accord Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 587 (6th Cir. 1994) (upholding the exclusion of the National Labor Relations Board's decision not "to issue a

complaint in response to [plaintiff's] unfair labor practice charge, involving the same subject matter as" the trial).

As this court has observed, that situation generally calls for excluding the report given "the 'likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency.'" L'Etoile v. New Eng. Finish Sys., Inc., 575 F. Supp. 2d 331, 334 (D.N.H. 2008) (quoting Paolitto v. John Brown E. & C., Inc., 151 F.3d 60, 65 (2d Cir. 1998)).  But those concerns are largely absent here because, as the plaintiff himself emphasizes, OSHA did not consider the defendants' responsibility for Masello's accident.  The plaintiff's motion to exclude the OSHA report--to say nothing of "any mention [of its] investigation"--is denied.[8]

---

[8]The motion (but not the supporting memorandum) separately requests the exclusion of the report's reference to broken stepstools at other Christmas Tree Shops locations that were discovered in the wake of Masello's accident.  In their response to the motion, the defendants acknowledge that the condition of stools at other stores is not relevant and have agreed to redact the report's references to that subject before seeking to introduce it.  The plaintiff has not separately challenged the admissibility of any of the other statements in the report, so the court has not considered them.

C.    **Preclusion of references to a November 2008 test of the
      product, and related spoliation instruction**[9]

During discovery, when the plaintiff asked ZAG for an
"exemplar of the Handy 2-Step" through his requests for
production, see Fed. R. Civ. P. 34, ZAG responded that it did
"not have an unused exemplar," but that its counsel "does have an
exemplar that can be inspected at the parties' convenience."  The
plaintiff, however, argues that this "exemplar" is different in
design from the Handy 2-Step used by Masello because the "rib"
connecting the bottom step to the left front leg contains "a
noticeable radius or significant arch."

The defendants take issue with this, however, maintaining
that both the stool used by Masello and the exemplar--and,
indeed, "[e]very single one of the Handy 2-Step stools" ever
sold--were produced by the same mold, which could not have been
readily modified to produce the alleged design change (in fact,
the exemplar was molded before the stool used by Masello).  The
defendants also challenge the "incredibl[e]" notion that ZAG
would have redesigned the stool to arch the rib connecting the
bottom step to the left front leg, but not the right front leg,
suggesting that the arch on the exemplar reflects a missing piece
of plastic, rather than an intentional design change.

---

[9]See document nos. 56-57.

It turns out that, at the time this suit was commenced, ZAG possessed at least one other used Handy 2-Step, which had been in service in its factory in Israel.  In November 2008, ZAG's quality assurance manager sent this stool to an independent laboratory in Hong Kong, Specialized Technology Resources, Ltd. ("STR"), for a "vertical static load test," in which different weights were placed on the top and the bottom steps of the stool in succession.  While the stool withstood a weight of 150 kilograms (330 pounds) on each step, a weight of 600 kilograms (1,320 pounds) placed on the top step caused the step to break, albeit without affecting the legs.

STR prepared a report of the test, dated December 1, 2008, but ZAG did not mention the test in its January 2009 answers to one of the plaintiff's interrogatories, which had asked it to identify testing of the Handy 2-Step conducted by or on behalf of ZAG.  The plaintiff first learned of the test during the deposition of ZAG, see Fed. R. Civ. P. 30(b)(6), in Tel Aviv, Israel, in October 2009, which is also when the defendants' counsel says he first learned of it.  The report was then promptly produced to the plaintiff, who now moves "to exclude the introduction into evidence[,] [or] reference to[,] this report by any lay witness or expert."

### 1.   The report's "trustworthiness"

As an initial matter, the report is hearsay.  See Fed. R. Evid. 801(c).  The defendants do not argue to the contrary, nor do they invoke any exception to the hearsay rule,[10] so the report itself cannot be admitted into evidence.

The defendants do argue that, under Rule 703, their expert witnesses can testify to the report as a basis for their opinions that the stool was properly designed.  Rule 703, as the court of appeals has explained, "specifically authorizes experts to rely on materials compiled by others as long as those materials are 'of a type reasonably relied upon by experts in the particular field.'"  Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) (quoting Fed. R. Evid. 703).  The plaintiff does not expressly argue that experts in plastics design or testing would not "reasonably rely" on the report of the tests performed by STR. Instead, he states that the report is "untrustworthy" because it omits "a corresponding videotape of the testing completed, contemporaneous communications or detailed dimensions and measurements"--data which he calls "critical to analyzing the legitimacy and integrity of the process."

---

[10]This is in contrast to the defendants' position on the reports of tests of the Handy 2-Step conducted in 1997 and 1999, which they argue are admissible under Rule 803(6)'s "business records" exception.  See infra Part II.D.

But the plaintiff does not provide any support for that statement, e.g., the opinion of his own plastics expert or an industry publication setting forth the requisite elements of a reliable load test.  The plaintiff's unsubstantiated critique of the report, then, provides the court with no basis to deem it an unreliable basis for expert testimony.  See Masello, 2011 DNH 061, 10-11 (rejecting the defendants' argument for excluding the opinion of the plaintiff's expert as to the cause of the stool's collapse because it was unsupported by any calculations as to the stress placed on the stool, where the defendant had not provided any support for the notion that such calculations were essential to such an opinion).  If the absence of a videotape or "detailed dimensions and measurements" from the report indeed calls its reliability into question under some recognized standard, then the plaintiff can make that point by cross-examining the defendants' experts about their reliance on it.  See id.

The plaintiff's real point as to the "trustworthiness" of the report seems to be that it fails to indicate whether the subject stool had an "arch" on the rib connecting the bottom step to the left front leg, as the plaintiff claims is present in the exemplar he was provided access to during discovery, or lacked that feature, as was the case with the stool that collapsed beneath Masello.  But this court is not prepared to rule that the

defendants' experts cannot reasonably rely on the test for this reason either, at least based on the present record.

Again, the defendants have come forward with the unchallenged testimony of ZAG's employees that every Handy 2-Step was made from the same mold and that, based on the dates of manufacturing runs stamped on the bottom of each stool, the exemplar stool was molded before Masello's stool was.  To intentionally produce an arched rib connecting the bottom step to the left front leg, then, ZAG would have needed to add material to the mold--only to intentionally remove that material from the mold before using it to make Masello's stool later.  Furthermore, ZAG would have needed to intentionally design the stool asymmetrically, so that the rib connecting the bottom step to the left front leg was arched, but the rib connecting the bottom step to the right front leg remained straight.

Moreover, the plaintiff has not come forward with any evidence suggesting that a stool with an arched rib on only one side of the bottom would perform any differently under testing than a stool designed without arched ribs on either side of the bottom step.  So, even in the highly unlikely event that the stool tested by STR had the same unusual "design" as the exemplar provided to the plaintiff in this litigation--and therefore a different "design" from the stool that collapsed beneath

21

Masello--it does not follow that the STR test cannot be relied upon in analyzing what caused Masello's stool to fail.[11]

On the present record, the plaintiff's theory that the arched rib in the exemplar stool embodied an intentional design change that may have also been present in the stool tested by STR is simply too far-fetched for the court to conclude that, under Rule 703, the resulting report cannot be relied on in assessing what caused the stool to collapse beneath Masello.  The plaintiff, of course, remains free to explore this theory with the defendants' experts on cross-examination if he chooses.

### 2.   Exclusion of the report as a sanction

For much the same reason, the court also disagrees with the plaintiff that the destruction of the stool during the testing by STR amounts to spoliation of evidence, warranting exclusion of the results from evidence as a sanction.  As a "companion to" the spoliation doctrine, which "permits an adverse inference from one side's destruction of evidence," a court has the "inherent power" to sanction a party who has "improperly altered or damaged" evidence.  Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d

---

[11]As the defendants emphasize, the plaintiff could have presumably figured out the effect (if any) of the single arched rib on test results by simply testing the exemplar provided by the defendants, but the plaintiff did not conduct any such tests.

444, 446 (1st Cir. 1997).  The court of appeals has explained that "[t]he intended goals behind excluding evidence" as a sanction for such conduct "are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss."  Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998).  Accordingly, both "the prejudice to the non-offending party and the degree of fault of the offending party" are "of particular importance when considering the appropriateness of sanctions."  Id.

Here, neither of these factors supports excluding the results of the STR testing as a sanction for the destruction of the stool during that testing.  First, the record does not support the plaintiff's suggestion that he suffered any prejudice from STR's destruction of the stool.  That stool was not the one involved in Masello's accident, which was made available to the plaintiff for testing during discovery, albeit in its fractured post-accident condition.[12]  Nor was the stool destroyed by STR the only other example of the Handy 2-Step that could have been

---

[12]As the defendants point out, that serves to distinguish this case from those imposing restrictive protocols on destructive testing of "[t]he actual, allegedly defective product which is the subject of [the] products liability lawsuit." 3 Louis R. Frumer & Melvin I. Friedman, Products Liability § 17.02[3][a] (1960 & 2011 supp).

made available to the plaintiff:  the defendants also gave him

access to another used sample of the product on which he could

have conducted his own testing.

Any claim of prejudice, then, would have to rest on the

notion that, because the exemplar had the arched rib on the left

front leg while the stool tested by STR did not, the destruction

of the stool by STR deprived the plaintiff of the chance to test

a "version" of the product that was the same as the "version"

used by Masello.  As just discussed, though, the plaintiff has

not come forward with any evidence that the presence of the

"arch" would have affected the results of the testing of the

exemplar, had the plaintiff elected to perform any.[13]  Nor has

the plaintiff provided any support for his suggestion that, aside

---

[13]This serves to distinguish the case on which the plaintiff
principally relies, Williams v. BIC Corp., No. 91-2216, 1996 WL
132984 (N.D. Ill. Mar. 21, 1996).  In that case, a products
liability action arising out of an allegedly defective cigarette
lighter, the court barred the plaintiff from introducing evidence
of her expert's destructive testing of "a unique lighter with
allegedly the same propensities as the lighter in question in the
case."  Id. at *4-*6.  Here, in contrast, there is no indication
that the stool used by Masello was "unique" in any way, let alone
in the same way the stool destroyed by STR might have been, so
Williams does not support the plaintiff.  Indeed, the court there
refused to bar the defendant from introducing evidence of its
expert's destructive testing of "100 random Bic lighters" because
the plaintiff failed to show that she was prejudiced as a result.
Id.

from the exemplar, the stool destroyed by STR was the only Handy
2-Step in existence at the outset of this litigation.[14]

Second, and relatedly, the court cannot attribute a high
degree of fault to ZAG for the destruction of the stool in the
test.  Again, that stool was neither the one involved in
Masello's accident, nor the stool identified by ZAG as the
exemplar, but was simply a used Handy 2-Step that ZAG happened to
have in service at its factory.  So there was nothing about the
stool sent to STR for testing that would have alerted ZAG that it
had any more relevance to this case than would any other used
version of the Handy 2-Step.  The plaintiff's Rule 34 request, in
fact, did not ask ZAG to produce every Handy 2-Step in its
possession, but only an "exemplar of the Handy 2-Step."  ZAG did
so and, once again, the plaintiff has come forward with nothing
to suggest that the arch present on that particular stool
detracted from its utility as an example of the product involved
in the accident.

---

[14]In his motion to exclude the STR test results, the
plaintiff asserts that, in response to his request for "step
stools for examination, analysis and testing," the defendants
responded that "none existed except for [the] exemplar," citing
to ZAG's formal response to the plaintiff's document requests.
As noted at the outset of this section, however, the plaintiff's
Rule 34 request asked ZAG for simply "[a]n exemplar of the Handy
2-Step," and ZAG responded simply that it did "not have an unused
exemplar."  The response does not state, or imply, that ZAG had
no other used Handy 2-Steps in its possession.

As the court of appeals has recently explained, a finding of spoliation based on the destruction of evidence is ordinarily supportable only where the circumstances of the destruction "support the logical inference that the evidence was favorable to" the adverse party. United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010). That is not a logical inference here, where there is nothing to suggest that the stool that was destroyed would have been helpful to the plaintiff's case, let alone anything to suggest that ZAG knew or should have known of that fact when it sent the stool off for testing. The court declines to prevent the defendants from relying on the STR test results at trial as a sanction for the destruction of the stool during the testing. The plaintiff's motion to preclude the defendants' witnesses from relying on those results is denied.

### 3. **Other sanctions for the defendants' discovery conduct**

Through a separate--but related--motion in limine, the plaintiff seeks an instruction to the jury that it may draw an adverse inference from "the Defendants' affirmative conduct and/or lack of diligence in complying with its [*sic*] discovery obligations." A party's spoliation of evidence can support such an instruction, but, for the reasons just discussed, that relief is not warranted here, at least based on the destructive testing

26

of the stool from ZAG's factory.  See, e.g., Laurent, 607 F.3d at 902-903.  The motion seeking the adverse inference instruction does not accuse ZAG of destroying any other evidence.[15]

Instead, the motion faults the defendants for having made incomplete or untimely responses to the plaintiff's discovery requests.  The plaintiff does not explain, though, how that charge--even if proven--would authorize the court to instruct the jury that they may draw an adverse inference against the defendants as a result.

While Rule 37 of the Federal Rules of Civil Procedure (which the plaintiff does not cite) empowers the court to "inform the jury of [a] party's failure" to comply with its duties under "to provide information or identify a witness as required by Rule 26(a) or (e)," Fed. R. Civ. P. 37(c)(1)(B), the plaintiff does not coherently explain how the defendants failed to do so.  The plaintiff states that, while "[f]or over a year into this litigation, Defendants maintained that they did not have a

---

[15]The motion cites the defendants' "inability to identify the specific polypropylene that composed the subject step stool," but does not tie that inability to ZAG's destruction of evidence beyond a suggestion that it "did not act with the diligence required."  Insofar as the plaintiff is seeking relief for this, the request is denied as insufficiently presented for the court to understand it.  It is also worth noting that the plaintiff was permitted to do a variety of destructive testing, including "infrared spectroscopy," on the very stool that collapsed beneath Masello.  Document no. 37 (granted by Order of Sept. 20, 2010).

product file . . . , just a day or even hours before depositions were scheduled to commence in Israel, documents constituting portions of a typical product file started to appear."  The plaintiff also complains that it was at the same time--late October 2009, after ZAG had provided its interrogatory answers, responses to document requests, and initial disclosures--that he first learned the identity of a ZAG engineer involved in designing the Handy 2-Step, so that witness "could not be searched for and deposed during the Israel trip."

Taking these statements at face value, the most they show is that ZAG failed to update its initial disclosures, interrogatory answers, and responses to the plaintiff's requests for production "in a timely manner" as required by Rule 26(e)(1)(A).[16]  But even if ZAG's disclosure of the documents and witness were untimely under Rule 26(e)(1), Rule 37(c)(1) does not allow sanctions for late disclosures that are "harmless."  Deciding whether to sanction a party for violating Rule 26(e), then, depends "mainly upon surprise and prejudice, including the opponent's ability to palliate the ill effects stemming from the late disclosure."

---

[16]ZAG explains (without contradiction) that it stopped making the Handy 2-Step in 2000, more than four years before Masello's accident and more than seven years before the action was filed, so it is not altogether surprising that ZAG did not have all of the information about the product at its fingertips before October 2009.

Thibeault v. Square D Co., 960 F.2d 239, 246 (1st Cir. 1992).
Here, by the plaintiff's own account, the disclosures occurred in
October 2009--more than two years prior to the current trial
date, nearly one year prior to the eventual deadline for the
plaintiff's expert disclosures, and some six months prior to the
eventual non-expert discovery cutoff.  So this is not "a case in
which a party was hindered in its ability to formulate a
response" by late disclosures of evidence.  Ferrara & DiMercurio
v. St. Paul Mercury Ins. Co., 240 F.3d 1, 10 (1st Cir. 2001).

     Indeed, the plaintiff does not even suggest that the timing
of the October 2009 disclosures had any adverse effect on his
ability to prepare the case for trial.[17]  Even if the defendants
violated Rule 26(e), then, that violation was harmless under

---

[17]Instead, the plaintiff suggests that his counsel could not
make effective use of his trip to Israel to take the depositions
of ZAG's witnesses.  The appropriate remedy for that
inconvenience, however, would have been an order requiring ZAG to
pay any resulting additional costs.  The plaintiff did not pursue
that relief at the time but rather, in December 2009, joined with
the defendants in a motion to extend all of the outstanding
deadlines in the case, citing, inter alia, "delays and discovery
disputes stemming from the ZAG depositions."  Document no. 31.
The motion was granted.  The motion also stated that those
disputes were "presently unresolved" but that the parties were
working to resolve them "without the need for judicial
intervention."  No further "judicial intervention" was ever
sought.  This history further undermines the plaintiff's request
to sanction the defendants for alleged discovery violations that
occurred two years ago.

Rule 37(c)(1), so no sanction is appropriate.  The plaintiff's
motion for that relief is denied.

### D.    1997 and 1999 test reports[18]

In its interrogatory answers, ZAG did identify testing of
the stool performed by another independent source, Consumer
Testing Laboratories, Inc. ("CTL"), at its facility in Canton,
Massachusetts, in November 1997 and again in November 1999.  CTL
no longer possesses the records of these tests, which were
discarded after the Canton facility closed in October 2001, but
ZAG does.  The records show, among other things, that the Handy
2-Step "demonstrates good load bearing characteristics capable of
withstanding 1,200 lbs. for one hour with no deformation or
failures noted."  The plaintiff has moved to exclude these
records from evidence, arguing that they are hearsay not subject
to the business records exception, see Fed. R. Evid. 803(6), and
are "untrustworthy."  These objections are without merit.

Rule 803(6) provides an exception to the hearsay rule for
records "of acts, events, conditions, opinions, or diagnoses,
made at or near the time by, or from information transmitted by,
a person with knowledge, if kept in the course of a regularly

---

[18]See document no. 58.

conducted business activity, and if it was the regular practice
of that business activity to make the records."  The plaintiff
argues that the records of the CTL tests do not meet this
standard because, while ZAG purports to possess copies of the
records, CTL itself no longer does.  But the defendants have
submitted a declaration by a CTL vice president, who was a
technician at its Canton facility from 1991 to 1996, that the
versions of the records in ZAG's possession are "on the same
letterhead in the same format as laboratory reports and technical
worksheets routinely generated by CTL" during the relevant
period, that these records "were made in the course of CTL's
regularly conducted activity," and that they bear the signature
of CTL's then-vice president and technical manager.  This
testimony suffices to satisfy Rule 803(6), which imposes no
"requirement that the records have been prepared by the entity
that has custody of them, so long as they were created in the
course of some entity's business."  5 Jack B. Weinstein
& Margaret Berger, <u>Weinstein's Federal Evidence</u> § 803.08[8][a],
at 803-81 (Joseph M. McLaughlin, ed., 2d ed. 1996 & 2011 supp.).

Rule 803(6), like Rule 803(8), provides an "exception to the
exception" in cases where "the source of the information or the
method of or circumstances of preparation indicate lack of
trustworthiness."  In arguing that the records of the CTL testing

fall within this exception, the plaintiff makes the very same points he makes about the records of the STR testing, i.e., that they "do not contain any photographs, contemporaneous communications or detailed dimensions or measurements" and therefore leave "uncertainty" as to whether the stools tested may have featured the same "arched" rib as the exemplar.  See Part III.C, supra.  Again, while the plaintiff is of course free to try to elicit testimony about that "uncertainty," it is simply too speculative on the present record for this court to deem the reports "untrustworthy" and exclude them from evidence.  The plaintiff's motion to exclude the CTL test results, or any reference to them, is denied.


**E.   Masello's personnel file, drinking, and pre-existing medical conditions**[19]

The plaintiff has produced a report from an economic consultant on the monetary losses occasioned by Masello's death, arriving at a total of $92,188.32 after deducting for living expenses and discounting to net present value.  The report assumes that, but for his death at age 59, Masello "could have continued to work as a stocker to the age of 67" at the Christmas

---

[19]See document nos. 60, 62, 64.

Tree Shops, and that his annual income from that job would have periodically increased.

But the defendants question these assumptions.  First, they point to references in Masello's medical records to his alcohol consumption--including one noting alcohol "abuse"--and the testimony of his designated medical expert that alcohol abuse adversely affects life expectancy.  They also note that Masello suffered from pre-existing medical conditions, including cerebral vascular disease (a narrowing of the arteries to the brain caused by his high blood pressure and diabetes), which his expert also acknowledged to have an adverse effect on life expectancy.

Second, the defendants rely on Masello's personnel file, which contains a number of written reports that, among other deficiencies, he was unproductive, disregarded instructions from (and in some cases yelled at) his supervisor, and punched back in on the time clock before he had finished taking his break.  In fact, Masello had twice received a "final warning" that further violations could result in firing.

The plaintiff, predictably, has moved to exclude evidence of Masello's (1) disciplinary record, (2) drinking, and (3) history of pre-existing medical conditions, arguing that it is, respectively, (1) inadmissible evidence of prior acts under Rule 404 of the Federal Rules of Evidence, as well as irrelevant and

33

unfairly prejudicial, (2) irrelevant and unfairly prejudicial because there is no indication that alcohol played a role in Masello's accident, and (3) inadmissible because the defendants have not disclosed any medical opinion that Masello's pre-existing medical conditions contributed to his death.[20]

These arguments all ignore the plaintiff's claims for damages. First, as just discussed, the plaintiff seeks to recover the wages Masello would have earned had he continued working at Christmas Tree Shops until age 67, while earning periodic raises. The records of Masello's performance at that job are plainly relevant to that claim, because they tend to suggest that he may have been terminated before then or not received the raises. See, e.g., EEOC v. Freudenberg-NOK Gen. P'ship, No. 07-406, 2009 WL 909571, at *2 (D.N.H. Apr. 3, 2009); Kilpatrick v. Breg, Inc., No. 08-10052, 2009 WL 199091, at *1 (S.D. Fla. Jan. 28, 2009).

That resolves the plaintiff's Rule 404 objection as well, because "the admission of evidence of other bad acts to assist the jury in measuring the extent of damages is a legitimate, non-character-based use of such evidence." Udemba v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001); see also, e.g., Cobige v. City of

---

[20]The plaintiff has not challenged, so the court has not considered, the admissibility of this evidence on other bases.

Chi., Ill., 651 F.3d 780, 784 (7th Cir. 2011) (ruling that evidence of decedent's prior misconduct was "relevant to how much loss [decedent's] estate and [survivor] suffered by her death" and thus not barred by Rule 404).  The court also overrules the plaintiff's Rule 403 objection to Masello's employment records, which is premised on the fear that they "imply that he had a propensity for carelessness that caused or contributed to the incident."  So far as the court can tell, the records do not reflect that Masello was "written up" for carelessness, but for other misconduct.

Second, the plaintiff makes a claim for compensatory damages "for the loss of Mr. Masello's life, that is, for the shortening of his life," which places how long Masello would have lived but for the accident directly in issue.  A decedent's "history of substance abuse is relevant to the issue of damages where there is evidence of its effect on probable life expectancy."  Fritts v. McKinne, 934 P.2d 371, 376 (Okla. Civ. App. 1996); see also Century '21' Shows v. Owens, 400 F.2d 603, 610 (8th Cir. 1968); St. Clair v. E. Air Lines, Inc., 279 F.2d 119, 121 (2d Cir. 1960); Kraus v. Taylor, 710 A.2d 1142, 1143-44 (Pa. Super. Ct. 1998); Pearce v. Fletcher, 328 S.E.2d 889, 890 (N.C. Ct. App. 1985); Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:39 (3d ed. 2009).  Here, as just discussed, there is

evidence in Masello's medical records that he abused alcohol and an acknowledgment from the plaintiff's designated medical expert that alcohol abuse can shorten life expectancy, so Masello's drinking is relevant.

The plaintiff's argument that this evidence is unfairly prejudicial because there is no indication that Masello had been drinking on the night of the accident or, indeed, ever drank at work actually supports the opposite proposition.  Without any hint that Masello drank on the job, there seems to be little realistic chance that the jury will infer that he did from his drinking off the job and that such drinking contributed to the accident.  If the plaintiff wants, however, he can insulate himself against any such risk by requesting an appropriate limiting instruction.

Finally, the same analysis applies to the evidence of Masello's pre-existing medical conditions:  they are relevant to his life expectancy (as the plaintiff's own medical expert has acknowledged), and the absence of any indication that they caused or contributed to his death actually reduces rather than increases the risk that the jury will consider them for that purpose instead.  As the defendants point out, the plaintiff's argument that the defendants cannot introduce evidence of Masello's pre-existing conditions because they have not

36

designated an expert to opine as them has been previously
rejected by this court.  See Aumand v. Dartmouth Hitchcock
Medical Center, 611 F. Supp. 2d 78, 84 (D.N.H. 2009) (ruling
that, even where medical matters are concerned, a defendant does
not need an expert witness to dispute the plaintiff's position on
factual issues).  Thus, the defendants--who do not have the
burden of proof on the issue of damages--are free to argue that
Masello's existing health conditions would have shortened his
life expectancy, even if they cannot adduce any expert testimony
to that effect.  The plaintiff's motions to preclude evidence of
Masello's job performance, drinking, and pre-existing medical
conditions are denied.


**F.    ZAG's internal marketing brochure**[21]

     The defendants, for their part, move to exclude evidence of
a marketing brochure on the "Handy 2-Step" that ZAG created to
educate of its sales force, but never distributed to any of its
customers.  The brochure shows photographs of the product by
itself and with a denim-clad man carrying it, sitting on the top
step, and placing his foot on the bottom step.  The brochure
contains text in four different languages, including English,

_____

     [21]See document no. 68.

that describes the attributes of the Handy 2-Step in a series of bullet points, e.g., "Sturdy two-step ladder," "Maximum load of 150 Kg (330lb)," "Made of strong, reinforced polypropylene for heavy-duty use," and "6-year warranty."

In moving to exclude this brochure, the defendants rely on its "internal nature," arguing that it was never shown to any of ZAG's customers and is therefore irrelevant to the plaintiff's breach of warranty claim.  As the plaintiff points out, though, it is relevant to at least one other issue in the case, namely, whether the conduct of Christmas Tree Shops in keeping the stool in use in its store was "reasonably foreseeable" so as to negate the defendants' superseding and intervening cause defense.  Reid v. Spadone Mach. Corp., 119 N.H. 457, 456 (1979).  The brochure's statements that the Handy 2-Step is "for heavy duty use" and has a "6-year warranty" have a tendency to make facts of consequence to the determination of this issue more or less likely and are therefore relevant.  See Fed. R. Evid. 401.  The defendants do not argue to the contrary.  Their motion to exclude the brochure from evidence is denied.

**G.    Other motions in limine**

Finally, the parties have filed several other motions in limine which can either be granted by assent or must be denied without prejudice to reasserting at trial.  These motions are:

> • the plaintiff's motion to preclude lay opinion testimony as to the safety of the stool:[22]  the defendants say they "have no intention of questioning lay witnesses as to whether the design of the Handy 2-Step created a defective condition unreasonably dangerous to consumers," but that they cannot respond more meaningfully because the plaintiff has not identified the anticipated lay opinions with any specificity.  The court agrees.  This motion is denied without prejudice to the plaintiff's objections to particular lay opinion testimony at trial.

> • the plaintiff's motion to exclude "a medical review completed for worker's compensation insurance purposes by a non-treating physician":[23]  the defendant assents to this motion, so it is granted.

> • the plaintiff's motion to exclude evidence of workers' compensation insurance coverage:[24] the defendants do not object to the motion insofar as it seeks to exclude evidence of the insurance payments Masello's estate received, which they acknowledge is barred by the collateral source rule. See, e.g., Aumand, 611 F. Supp. 2d at 90-92.  They do, however, object to preemptively excluding any reference whatsoever to the existence of this coverage, suggesting that it is the workers' compensation carrier who bears the responsibility for losing the broken pieces to the stool involved in the accident.  See note 4, supra.  But the court cannot tell from the defendants' submission whether they intend to introduce evidence to that effect in the first instance or whether they are simply reserving the

---

[22]Document no. 59.

[23]Document no. 63.

[24]Document no. 66.

right to do so if the plaintiff opens the door on that
issue.  Accordingly, this motion is moot insofar as it seeks
to exclude evidence of the workers' compensation  insurance
payments, and is otherwise denied without prejudice to
reargument based on developments at trial.

• the plaintiff's motion to declare the defendants'
representatives hostile witnesses:[25]  this motion fails to
identify any particular witnesses, so it is denied without
prejudice to the plaintiff's ability to seek to have certain
witnesses declared hostile at trial.

• the defendants' motion to preclude reference to the fact
that ZAG's counsel interviewed the plaintiff's designated
plastics expert as the defendants' potential expert witness
before the plaintiff retained him:[26]  the plaintiff assents
to this motion, so it is granted.

## III. <u>Conclusion</u>

For the foregoing reasons, the plaintiffs' first, second,

third, fifth, sixth, seventh, ninth, and tenth motions in

limine[27] are DENIED.  The plaintiff's fourth, eleventh, and

twelfth motions in limine[28] are DENIED without prejudice to their

reassertion at trial.  The plaintiff's eighth motion in limine[29]

---

[25]Document no. 67.

[26]Document no. 69.

[27]Document nos. 56-58, 60-62, 64-65.

[28]Document nos. 59, 66-67.

[29]Document no. 63.

is GRANTED by assent.   The defendants' first motion in limine[30]

is DENIED.   Their second motion in limine[31] is GRANTED by assent.


   **SO ORDERED.**

   _____
   Joseph N. Laplante
   United States District Judge

Dated: November 29, 2011

cc:   Daniel W. Buckley, Esq.
      Gerry D'Ambrosio, Esq.
      Peter A. Brown, Esq.
      Christopher A. Duggan, Esq.
      Gerard A. Butler, Jr., Esq.
      Karyn P. Forbes, Esq.
      Pauline A. Jauquet, Esq.

---

   [30]Document no. 68.

   [31]Document no. 69.